**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CENTRAL DIVISION**

THOMAS H. CLARK,

        Plaintiff,

vs.

JO ANNE B. BARNHART,
Commissioner of Social Security,

        Defendant.

No. C05-3039-MWB

**REPORT AND RECOMMENDATION**

---

*TABLE OF CONTENTS*

I.     **INTRODUCTION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **2**

II.    **PROCEDURAL AND FACTUAL BACKGROUND** . . . . . . . . . . . . . . . . . **2**

    *A.*    *Procedural Background* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **2**
    *B.*    *Factual Background* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **3**
        *1.*    *Introductory facts and Clark's hearing testimony* . . . . . . . . . **3**
        *2.*    *Clark's medical history* . . . . . . . . . . . . . . . . . . . . . . . . . . **8**
        *3.*    *Vocational expert's testimony* . . . . . . . . . . . . . . . . . . . **18**
        *4.*    *The ALJ's decision* . . . . . . . . . . . . . . . . . . . . . . . . . . . . **20**

III.   **DISABILITY DETERMINATIONS, THE BURDEN OF PROOF, AND
THE SUBSTANTIAL EVIDENCE STANDARD** . . . . . . . . . . . . . . . . . . **22**

    *A.*    *Disability Determinations and the Burden of Proof* . . . . . . . . . . . **22**
    *B.*    *The Substantial Evidence Standard* . . . . . . . . . . . . . . . . . . . . . **25**

IV.   **ANALYSIS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **27**

V.    **CONCLUSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **30**

# I. INTRODUCTION

The plaintiff Thomas H. Clark ("Clark") appeals a decision by an administrative law judge ("ALJ") denying his application for Title XVI supplemental security income ("SSI") benefits. Clark claims the ALJ erred in failing to identify which of Clark's impairments he considered to be "severe," and in assessing Clark's residual functional capacity. (*See* Doc. No. 12)

# II. PROCEDURAL AND FACTUAL BACKGROUND

## A. Procedural Background

On October 16, 2002, Clark protectively filed an application for SSI benefits (*see* R. 13, 20).[1] Clark alleged he had been disabled since May 10, 2000 (R. 55), due to back and neck problems, high blood pressure, depression, and "sight problems." (R. 81) He claimed he was unable to "stand or walk for long periods," and he could not lift. (*Id.*) He stated he stopped working because his employer had no light work available for him. (*Id.*) Clark's application was denied initially and on reconsideration. (*See* R. 13)

Clark requested a hearing (*id.*), and a hearing was held before ALJ Andrew Palestini on July 22, 2004, in West Des Moines, Iowa. (R. 272-320) Clark was represented at the hearing by attorney Kenneth A. Johnson. Clark testified at the hearing, and Vocational Expert ("VE") Elizabeth Albrecht also testified.

On December 21, 2004, the ALJ ruled Clark was not entitled to benefits. (R. 10-21) Clark appealed the ALJ's ruling, and on May 3, 2005, the Appeals Council denied

---

[1] Clark filed an application for disability benefits in December 1990, and the application was denied. He filed another application in September 1993. The application was granted on the basis of a finding that Clark could not return to his past relevant work or make a vocational adjustment to other work due to "severe degenerative arthritis of the lumbar spine at L5-S1, and degenerative disc disease of the L5 disc; chronic low back and neck pain; pain and intermittent swelling of the right scrotum; and recurrent inflammatory uveitis of the left eye." (R. 34-35)

Clark's request for review (R. 3-7), making the ALJ's decision the final decision of the Commissioner.

Clark filed a timely Complaint in this court, seeking judicial review of the ALJ's ruling. (Doc. No. 4) In accordance with Administrative Order #1447, dated September 20, 1999, this matter was referred to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B), for the filing of a report and recommended disposition of Clark's claim. Clark filed a brief supporting his claim on October 14, 2005. (Doc. No. 12) The Commissioner filed a responsive brief on December 9, 2005. (Doc. No. 13) Clark filed a reply brief on December 19, 2005. (Doc. No. 14) The matter is now fully submitted, and pursuant to 42 U.S.C. § 405(g), the court turns to a review of Clark's claim for benefits.

### B.  Factual Background

#### 1.  Introductory facts and Clark's hearing testimony

Clark was born in 1948, making him fifty-five years old at the time of the hearing. He is 5'10" tall. He stated he used to weigh 240 pounds, but he has lost perhaps twenty pounds because he forgets to eat. (R. 275-76) He is right-handed.

Clark graduated from high school. He has "a little trouble" reading, and cannot read and understand a newspaper "very well." (R. 276) If he has "the urge," he is able to write a letter to a friend or family member. (R. 277) He can do simple arithmetic. (*Id.*) He took some welding courses after high school, and he learned to operate a "machine tool and dye" during vocational rehabilitation. (R. 307) However, he stated any work he did in those areas was prior to the last fifteen years. (R. 308) He stated vocational rehabilitation has been unable to find work for him due to his health problems. (*Id.*)

Clark last worked as a highway flagger about four years prior to the hearing. The job lasted a few weeks, off and on. Some months, he earned over $500, and other months he earned less. (R. 277-78) He also has worked as a semi-truck driver, but he could not recall exactly when, other than to say it was during the last fifteen years. He sold used cars part-time for several weeks during two consecutive summers, "fill[ing] in here and there." (R. 278, 280) He sold a few cars, but mostly he would "just watch[] the place." (R. 279) He thought he made more than $500 a month on occasion, but stated he did not make much more than that. (*Id.*)

Clark stated he received SSI payments from 1993 until around 1999 or 2000. According to Clark, his payments were stopped because the Social Security Administration used his ex-wife's income to determine he had been overpaid, even though he was not living with her. Clark stated he did not receive notification that his benefits were being stopped in time for him to file an appeal. (R. 281)

Clark stated he is unable to work due to problems with his back and neck, depression, and inability to get along with people. He has had surgery on his low back and neck, but he was unable to describe the types of surgery. He has pain in his lower back that sometimes is sharp and severe, and other times is "just like a catch in it." (R. 282) He has pain several times a day, and he takes pain medication. He also has pain in his mid to upper back that radiates down his left arm, causing him to lose his grip strength. (R. 282-83) He gets numbness and tingling down his left arm "[a]ll the time." (R. 283-84) According to Clark, his doctor has mentioned carpal tunnel syndrome as the cause for his left arm problems, and has suggested surgery as possible treatment. Clark stated he has had problems with his left wrist for four or five years. (R. 284) As far as his right hand, Clark stated he does not have the same degree of problems, but his grip strength is weaker than it used to be. (*Id.*)

Clark stated his lower back pain radiates down his legs. He experiences a sharp pain in his legs at times, and numbness and tingling in his legs at other times, causing him to lose his balance and fall down. He stated he loses his balance two or three times a month. If he walks over a couple of blocks, he will get swelling and pain in his groin area. (R. 285)

Clark stated his vision in his right eye is very blurry and he has pain both in the eye itself and a headache-type of pain from his eye. He stated he has headaches most of the time, and his doctor has told him to take Tylenol and "some kind of . . . pain medicine . . . just to keep [him] asleep sometime." (R. 286-87) He stated he had an accident and injured his eye "a long time ago," and his eye had been getting more blurry for a couple of years. He stated his prescribed pain medication makes him very tired and puts him to sleep. (R. 287)

Clark is diabetic. When he takes his insulin injections and watches his diet, he can keep his blood sugary under pretty good control. He sometimes has neuropathy in his hands and feet. He stated he sometimes cannot afford to buy insulin, and then his blood sugar and symptoms get worse. (R. 288-89)

Clark stated he has breathing problems, and he uses an Albuterol inhaler four or five times a day. He also has a nebulizer machine at home that he uses for breathing treatments a couple of times a week. Clark has two teenagers who live with him, and they help him with the nebulizer treatments. Clark stated he gets short of breath if he walks, stoops over, or climbs steps. He can walk two blocks most of the time if he stops and rests along the way, but he will be tired and short of breath after walking that far. He indicated standing at rest does not cause him problems, and he can sit as long as he can lean forward or backward and change his position. However, he sometimes has problems sitting for very long if he is having a lot of pain in his back or legs. He has problems bending, stooping, crawling, and kneeling due to pain in his back, legs, and arms. He has problems

lifting, and difficulty bending over to pick up objects. Walking up and down steps causes him pain in his back and joints. Using his arms for pushing and pulling activities causes cramps and pain in his arms. According to Clark, his doctors have told him not to lift over fifteen pounds. (R. 289-94)

Clark stated he sees either a psychologist or a psychiatrist at a mental health center in Fort Dodge. He was treated there for awhile a few years ago, and he started going again two or three months prior to the hearing. He stated he has been taking Prozac for about thirteen years, and his dosage has remained unchanged for about the last three years. He assumes he gets benefit from the Prozac because other people tell him they notice if he does not take the medication. He stated he is mostly stable as long as he takes his medication. (R. 295-96) However, even on the Prozac, he still has trouble getting along with people. He tends to be edgy and gets into fights frequently. (R. 296-97) He stated he does not spend time around people and has no friends. He gets along fairly well with his children, but does not get along with other family members. (R. 298)

Clark stated he has problems with memory and concentration. On a good day, he is better able to remember things, but he still has memory problems even on good days. (R. 298-99) According to Clark, his energy level is very low and he is "moody as hell." (R. 300) He has frequent urges to hurt himself, and he has acted on those feelings in the past. He sometimes feels sorry for himself and has crying spells. (R. 300)

Clark stated he started seeing a mental health professional again because there were "things going on pretty bad around there . . . in [his] mind." (R. 301) According to Clark, a doctor and a vocational rehabilitation person recommended he get back into therapy. (R. 301)

Clark stated his sister helps with his cooking, cleaning, and shopping. His children also do some of the cooking, all of the yard work, and some of the shopping. An older daughter comes over to do his laundry. (R. 301-02) Clark spends his days lying on a

swing on his porch during good weather. He walks around his house, rides with his children to the store, and plays with his dogs. He does not have other social activities. (R. 302) Clark initially stated he does not drink alcoholic beverages or use illicit drugs, but he then stated he "drink[s] a little whiskey every once in a while[.]" (R. 302-03) Clark stated he does not leave his house at all for two or three days each week, and sometimes he stays in bed all day. He often goes without eating and stated he has "lost a lot of weight." (R. 305) He stated in the past, he was "big and [had] big arms," but he has lost a lot of weight because he forgets to eat. (*Id.*)

Clark stated he has sharp, hard pains in his chest together with shortness of breath. According to him, doctors have indicated it is not his asthma and they have recommended he see a cardiologist, but he has been unable to afford to see the specialist. He indicated he gets the chest pains about once a week. He stated that during the week prior to the hearing, he had been taken by ambulance to the hospital on two occasions when he had chest pain and difficulty breathing. He was unable to describe his discharge diagnosis, saying they just told him to pay his bill. He stated he has several thousand dollars of unpaid medical bills already and he cannot afford to see a doctor. (R. 303-04)

Clark does not believe he could return to driving a truck because of his back pain and the lack of strength in his hands and wrists. (R. 304) He stated he probably could sell used cars again "for a short period of time," but he does not see well enough to do the required paperwork and he also would have trouble dealing with people on the job. (R. 304-05) He stated it would be difficult for him to handle any job that required him to deal with people. (R. 306) He stated he could not handle the physical requirements of the highway flagman job. (R. 305)

The court notes Clark's income records indicate he had no reported earnings from 1986 through 1990; $70.00 in earnings in 1991; no reported earnings from 1992 through

1996; and earnings of $5,839.43 in 1997; $5,369.11 in 1998; $7,020.09 in 1999; and $1,104.26 in 2000. (R. 76; *see* R. 70-79)

The court further notes Clark went to the Social Security Administration office in Fort Dodge, Iowa, on November 27, 2002, for assistance in completing his daily activities form and other forms related to his application for SSI benefits. The SSA employee who assisted Clark completed a Report of Contact form on which he indicated Clark had no problem sitting during the thirty-five to forty minute interview, but "[w]hen he left he walked with a limp with most of his weight on the left side." (R. 95) He noted that although Clark mentioned he had vision problems and needed thick lenses, he "didn't seem to have difficulty seeing/signing the forms." (*Id.*) He indicated Clark "had difficulty maintaining eye contact, and it was difficult to get information from him." (*Id.*) From the employee's observation of Clark during the interview, he noted Clark exhibited no difficulty hearing, breathing, understanding, coherency, concentrating, talking, answering, sitting, standing, walking (except as indicated), seeing, using his hands, or writing. (R. 93)

## 2.     *Clark's medical history*

Clark alleges a disability onset date of May 10, 2000. (R. 55) Therefore, the court will omit discussion of the record evidence for earlier time periods, except where necessary to place Clark's medical history into context.

From April 1998 to July 2001, Clark saw Subhash Sahai, M.D. for everything from depression to sexual dysfunction, and hypertension to chest pain. (*See* R. 157-69) In April 2000, Clark saw a physician's assistant at Dr. Sahai's office for "an M&M Service physical." (R. 160) The P.A.'s notes indicate Clark had, in the past, experienced "episodes of anginal type chest pain," and stress tests had been inconclusive. The P.A. concluded it was possible Clark had "significant coronary artery disease and angina,

especially due to his multiple risk factors." (*Id.*) He was advised to obtain further evaluations if his increased work activity caused him to experience chest pain or other symptoms. (*Id.*)

The next record evidence that Clark sought medical treatment again was in June 2001, when he saw Dr. Sahai with complaints of weakness of his entire right side after a fall. He stated he was unable to use a computer mouse or write with his right hand. He complained of weakness in his right leg that came and went. He also reported trouble with his vision and problems expressing himself. Clark had been on Prozac 20 mg twice daily for some time, and he requested a refill. He also reported that he had been on a blood pressure medication prescribed by a doctor in Missouri, but he could not recall the name of the medication. Clark stated he had been told carpal tunnel syndrome might be causing his reduced hand and grip strength. The doctor recommended an MRI, chest x-ray, and lab studies. Clark refused to have any of the testing, but indicated he would call to schedule an appointment after he checked with his insurance company. (R. 159)

On July 5, 2001, Clark saw Dr. Sahai for follow-up after being evaluated in the emergency room after falling and striking the right side of his body and head. He complained of neck pain, some light-headedness, chest pain, difficulty breathing, difficulty walking, and problems straightening out his legs. Examination of Clark's right leg revealed he had difficulty bending his right knee and a small abrasion. Examination of his chest showed decreased breath sounds. X-rays of Clark's chest, cervical spine, and knee were all within normal limits. The doctor recommended Clark take Advil as needed. Clark stated he had "lost all his medications," so the doctor gave him refills of Prozac and Viagra. (R. 158-59)

In December 2001, Clark saw a doctor at Trimark Family Practice with complaints of groin pain. The doctor diagnosed mild epididymitis.[2] He prescribed Cipro. (R. 177) Clark returned to Trimark for follow-up on December 14, 2001, still complaining of some groin pain. The doctor "told him perhaps with some luck, he [was] just having some discomfort from congestion and if he [had] sex maybe it [wouldn't] hurt so much." (R. 176) Clark stated he had "gotten back on Title XIX" and he requested refills of all of his medications. The doctor wrote prescriptions for one year's refills of the following medications: Prozac 20 mg twice daily (an antipsychotic medication used to treat depression); Norvasc (indicated for treatment of chronic, stable angina); Ranitidine (for symptomatic relief of gastroesophageal reflux disease or GERD); Metoprolol (for hypertension); Metoclopramide (for symptoms of GERD); and Viagra (for erectile dysfunction). (*See* www.rxlist.com for drug descriptions and information.) Clark was advised to have his blood pressure checked about two weeks after he resumed taking his blood pressure medication. (*Id.*)

Clark returned to Trimark for follow-up on December 27, 2001, complaining that his groin pain had not improved and he had developed a rash. He complained of shortness of breath at times, and continued sexual dysfunction. Thinking the Prozac might be contributing to Clark's sexual problems, the doctor asked if Clark thought he still needed the medication. He responded that his wife could tell when he did not take the Prozac and, according to Clark, had told him he gets "mean as hell" when he does not take it. (R. 175) The doctor prescribed a trial of Lamisil for Clark's rash. He cut the Metoprolol dosage and started Clark on Altace. He also gave Clark three packs of 50 mg. Viagra, noting, "I am not at all sure that at times [Clark] just doesn't come with complaints so that he can have an excuse to be here and get some Viagra samples." (*Id.*)

---

[2]"Epididymitis" is inflammation of the sperm cords along the posterior border of the testis. *See Dorland's Pocket Medical Dictionary*, 248 (23rd ed. 1982).

On January 21, 2002, Clark underwent a psychodiagnostic evaluation by William E. Morton, Psy.D. at the request of Disability Determination Services (R. 178-80), for the purpose of determining Clark's "ability to function in various work related activities, paying particular attention to his current mental status." (R. 178) Clark reported that he lived alone in a single-family dwelling. He was divorced and had sixteen children, two of whom had been killed in a drive-by shooting. He was able to drive. He went to doctors' appointments alone, but required assistance in remembering to take his medications. He got no exercise and slept only three or four hours per day. He stated he did no cooking, housework, yard work, or laundry. He was able to do his own grooming, manage his own finances without assistance,[3] and could go shopping without help. Overall, Dr. Morton found Clark's level of independent functioning to be fair. (*Id.*)

During the evaluation, Clark "evidenced no difficulty with extended sitting or arising from a seated position." (R. 179) He communicated appropriately and without difficulty. Screening was positive for symptoms of depression and anxiety, but his mood appeared to be stable, and he appeared to have adequate judgment, insight, and impulse control. Dr. Morton diagnosed Clark with Dysthymic Disorder and Post-traumatic Stress Disorder (PTSD), and assessed his current GAF at 60.[4] He reached the following conclusions regarding Clark's work-related abilities from a mental standpoint:

> It appears that Mr. Clark is able to adequately self-care and attend to the activities of daily living. He reports that he adequately manages his own finances and thus could handle

---

[3] A note in the history section of the report that Clark was "*not* able to adequately manage finances without the assistance of others" appears to be a scrivener's error, given the doctor's conclusion that Clark "adequately manages his own finances and thus could handle cash benefits should he receive them." *Compare* R. 178 *with* R. 180.

[4] A GAF of 51-60 indicates "moderate symptoms (*e.g.*, flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (*e.g.*, few friends, conflicts with peers or co-workers)." *American Psychiatric Assoc., Diagnostic and Statistical Manual of Mental Disorders*, 32 (4th ed. 1994).

cash benefits should he receive them. It appears that there are moderate mental limitations in regard to remembering and understanding instructions, procedures, and locations; carrying out instructions; maintaining attention, concentration, and pace; interacting appropriately with supervisors, co-workers, and the public; or using good judgment and responding appropriately to changes in the work place. These limitations are based on his current level of depression, for which he is receiving minimal treatment. It is recommended that he seek out additional treatment, and this was stated to him. It is likely that the previously stated limitation would decrease with adequate mental health care.

(R. 180)

Clark returned to Trimark for follow-up on February 6, 2002. He complained of feeling weak for two weeks, being somewhat dizzy, and having problems with his testicles "swelling up" off and on. (*Id.*) He was still having problems with sexual dysfunction, and stated he had to take two 100 mg. Viagra to perform. He also reported ongoing low back pain. He stated his rash had cleared up while he was taking Lamisil, but it returned as soon as he stopped taking the medication. No changes were made to his medications. Clark requested a new prescription for Viagra. (*Id.*)

Clark returned to Trimark for follow-up on March 13, 2002. He stated he had been in Texas, and had become very short of breath. Accordingly to Clark, doctors "wanted to hospitalize him but he didn't want to stay so he came home and they sent home an aerosol machine with him [which was] not working well." (R. 174) His lungs were fairly clear on examination. The doctor referred him for a cardiology work up. (*Id.*) Clark failed to appear for his appointment with the cardiologist. (*Id.*)

Clark saw a doctor at Trimark on April 3, 2002, with complaints of headaches and abdominal pains for three to four days, with some vomiting and diarrhea. He stated he felt like his stomach did not empty after he ate. He was started on Prevacid, with instructions to return in a few days if his symptoms did not improve. (*Id.*)

On May 20, 2002, Clark was seen in the emergency room in Fort Dodge, Iowa, for an injury to his right wrist. X-rays of his right forearm showed soft tissue swelling and edema, but no fracture, dislocation, or other abnormalities. The ER record is largely illegible, but it appears some type of bandage was applied to Clark's wrist and he was given prescriptions for Lortab and Cipro. (R. 170-71)

On July 16, 2002, Clark returned to Trimark complaining of "vomiting up some blood." (R. 173) Notes indicate Clark looked "pretty big, strong and robust," with good color. (*Id.*) The doctor noted he had referred Clark to a specialist for an upper and lower GI series in March 1999, but he had no reports indicating Clark had been to the specialist. At this visit, Clark again was referred to a specialist for testing, and he received some samples of Prevacid. (*Id.*) The record does not indicate Clark went to see the specialist.

Clark saw a doctor at Trimark on December 20, 2002, with complaints of left shoulder pain for about three weeks. He also complained of right groin pain, and redness and mattering of his right eye. On examination, Clark was "tender throughout his whole trapezius, behind his shoulder, over the top of the shoulder and at the deltoid." (*Id.*) His eye was a little red, but was improving without treatment. The doctor prescribed a nonsteroidal anti-inflammatory, and also prescribed Ultram for pain. (*Id.*)

Clark returned for follow-up on January 6, 2003. He stated the medications and heat had helped some, although his left shoulder still hurt. Clark stated he had not been taking his blood pressure medication because he had no medical coverage to pay for the medication. Examination revealed Clark's shoulder, neck, and surrounding muscles all were tender. The doctor prescribed five days' of Prednisone, and also prescribed a muscle relaxer. (R. 186)

On January 16, 2003, Clark underwent a disability determination exam by E. Reveiz, M.D. (R. 181-84) Dr. Reveiz noted Clark's gait was somewhat slow but satisfactory. After examination, his diagnoses were: "1) Osteoarthritis back, mild to

moderate"; "2) Status post fusion back and disc removal by history"; "3) Diabetes mellitus type I"; "4) Chronic bronchitis secondary to smoking." (R. 182) The doctor opined Clark "could do some type of sedentary job," and he noted Clark was "willing to be retrained." (*Id.*) He found Clark's visual changes would not impair him from driving or reading. He opined Clark would have the following work-related limitations:

> He has driven a truck before and I think he could continue doing this if he doesn't have to load or unload the truck. There should be limitation in carrying and lifting, no more than 15 lbs at a time and not repetitive. He should not stand in one place constantly, he can move around and walk, this would benefit his diabetes. He will be able to sit for a four hour day. Stooping, climbing, kneeling and crawling should be limited but not completely. No problems with handling objects, seeing, hearing, speaking or traveling. The work environment in relation to fumes, dust, temperature and general hazards is not an issue. He does have some diabetes but the diabetes could be controlled with Insulin and oral medications and diet. He is not particularly overweight. I am not sure he has any signs of depression or if he has some diagnosis of depression, it is pretty well controlled with Prozac.

(*Id.*)

On January 31, 2003, Janet McDonough, Ph.D. reviewed the record and completed a Psychiatric Review Technique form. (R. 191-204) She found the record indicated Clark has diagnoses of dysthymia and an anxiety disorder that would cause him mild limitations in the areas of maintaining social functioning and maintaining concentration, persistence, or pace, and no episodes of decompensation. (*Id.*) In her review summary (R. 189-90), Dr. McDonough noted Clark's "allegation of depression is supported by the [medical evidence of record], although the degree of functional limitation is not severe enough to be considered disabling[.]" (R. 189) She found Clark's impairments to be non-severe,

and not equal to any mental listing. (*Id.*) On March 27, 2003, David A. Christiansen, Ph.D. reviewed the record and concurred in Dr. McDonough's assessment. (R. 191)

On February 11, 2003, Gary J. Cromer, M.D. reviewed the record and prepared some review comments setting forth his conclusions. No accompanying Physical Residual Functional Capacity Assessment form is in the record. In his review summary, Dr. Cromer opined Clark has non-severe, medically-determinable impairments of mild obesity and hypertension, neither of which would interfere significantly with basic work activities. He found Clark had "failed to document underlying medically determinable impairments to support his subjective allegations of neck pain, back pain, and vision problems," and Clark's credibility was "significantly eroded by the vague and diffuse nature of his complaints, the question of an underlying functional component, minimal exam abnormalities, observed behavior exceeding limitations alleged . . ., and absence of [medical evidence] to support several of his allegations." (R. 205) Dr. Cromer gave little weight to Dr. Reveiz's opinions because he found them not to be supported by objective findings, and not to address inconsistencies in Clark's complaints. (*Id.*)

On March 27, 2003, J.D. Wilson, M.D. reviewed the record and concurred in Dr. Cromer's assessment. (R. 205) Dr. Wilson noted that when Clark sought treatment for his shoulder pain in December 2002 and January 2003, he "made no mention of being short of breath or having sharp pain in his back, legs or hips," and only sought treatment for his shoulder. (R. 206) He had not returned for further treatment for his shoulder since January 3, 2003. Dr. Wilson therefore found Clark's allegations that he suffers from shortness of breath and sharp pains in his back, legs, and hips to be "eroded to some degree." (*Id.*)

On July 31, 2003, Clark went to the emergency room complaining of difficulty breathing, and requesting Prozac. (R. 262-71) He had an EKG that showed normal sinus rhythm, and "borderline left atrial abnormality." (R. 235) A chest x-ray showed Clark's

heart to be "mildly enlarged but stable," but indicated "[n]o acute cardiopulmonary process." (R. 233) Clark was diagnosed with nonspecific chest pain. (R. 262)

Clark was seen in the emergency room again on August 1, 2003, complaining of shortness of breath. (R. 256-61) A chest x-ray showed evidence of previous infection but otherwise his lungs were clear and there was no evidence of acute chest disease. (R. 228) He was diagnosed with costochondritis, possible myositis, and mild asthma exacerbations. (R. 256) He was discharged with a prescription for Darvocet. (R. 257)

Clark was seen again in the emergency room on August 5, 2003, with complaints of abdominal pain and nausea. X-rays of his abdomen showed a probable pelvic phlebolith, and "[n]onspecific bowel gas pattern with distention of the stomach," likely "due to air swallowing." (R. 214) He was diagnosed with constipation and epididymitis. (R. 213; 249-55)

After he left the hospital on August 5, 2003, Clark underwent a psychiatric evaluation by Shaheena Minhas, M.D., at North Central Iowa Mental Health Center. (R. 268-71) Clark stated he was depressed and was running out of his Prozac. His mental status exam indicated he had depressed mood, appropriate affect, coherent and goal-directed thought process, and fair impulse control, insight, and judgment. Based on the history Clark provided, the doctor diagnosed him with "Major Depressive Disorder, moderate, recurrent"; "Rule out Bipolar Disorder"; and "Rule out Impulse Control Disorder." (R. 270) The doctor assessed Clark's current GAF at 55.[5] Dr. Minhas discussed treatment options with Clark, and he agreed to make an appointment for counseling. (R. 271)

Clark returned to the emergency room on August 9, 2003, complaining of shortness of breath, vomiting, and cold sweats. ER notes indicate there was a deputy in the room

---

[5] *See* note 4, *supra.*

with Clark.  He was diagnosed with "multiple complaints, prob[ably] somatization."  He was discharged in good condition.  (R. 222; 245-48)

Clark again was seen in the emergency room on August 22, 2003, complaining of chest pain.  (R. 224; 238-44)  Notes indicate Clark was overheated upon arrival.  He reported that he had been outside working and had gotten a sharp pain in his chest radiating down his left arm which dropped him to his knees.  He was given nitroglycerin and his pain reduced.  An EKG continued to show normal sinus rhythm and "borderline left atria abnormality."  (R. 225)  Clark refused an x-ray, said he was fine, and left against medical advice.  (R. 224)  He stated he had just been working too hard.  (R. 244)

On September 29, 2003, Clark underwent a cardiopulmonary evaluation by Syed M. Ahmed, M.D.  (R. 211-12)  Based on the history provided by Clark, the doctor found he had "multiple risk factors for coronary artery disease, including hypertension, hyperlipidemia and nicotine abuse."  (R. 212)  He counseled Clark about quitting smoking, which Clark stated he planned to do.  Clark was scheduled for a stress test, echo-cardiogram, and lipid profile, and the doctor increased Clark's Altace dosage "for better control of his blood pressure."  (*Id.*)

Clark saw a doctor at Trimark on September 30, 2003, for medication refills.  Notes indicate Clark's diagnoses at that time were hypertension, and depression which was stable as long as Clark was on his medication.  (R. 237)

Clark returned to Trimark for follow-up on October 3, 2003, complaining of back pain.  Notes indicate the following, among other things:

> He gimps around and has somewhat reduced range of motion in all the planes and fusses and grunts when he goes through the range of motion.  He said sitting stretch test causes some pain in his back also but he comes up easily on straightening his leg.  His thighs have very strong musculature and his deep tendon reflexes are 2+ throughout.  He says he needs a letter to the Child Support Recovery Division, saying that he is on Disability and can't work.  He tells a long, somewhat

17

> condiluted [sic] story of having been on SSI since 1993 but
> recently they "over paid me" and so he has not been on it
> while things get straightened out. He seems to think that he's
> going to go back on it and they are going to pay him back
> some things soon. . . . I told him I'd write the letter although
> it's not clear to me exactly what I'm supposed to tell them. I
> don't have any direct avenues that he's on SSI or confirmation
> of his story, just what he has told me.

(*Id.*) Clark asked for a Viagra prescription and samples, which were provided. (*Id.*)

Clark saw his doctor at Trimark on March 4, 2004, complaining of erectile dysfunction. He was referred to a urologist to discuss possible treatments, and he was given samples of Cialis, Levitra, and Viagra. (R. 236)

### 3.   *Vocational expert's testimony*

The ALJ asked VE Elizabeth Albrecht the following hypothetical question:

> Initially, I'd like the vocational expert to consider what
> a factor would have on the claimant's ability to perform work
> if he was limited to lifting no more than 50 pounds occasional
> . . . 25 pounds frequent. But he's able to sit for eight hours in
> a day with normal breaks. Can stand for up to eight hours in
> a day with a normal break every two hours. Could occa-
> sionally bend, squat, crawl, stoop, climb stairs. Can push or
> pull no more than 50 pounds. Work should be simple, routine,
> and repetitive. It should involve no more than superficial
> interaction with the public and the public may be present in the
> work area. It should involve no more than superficial
> interaction with co-workers to perform the duties and again,
> the workers may be physically present in the work area. The
> work should not be stressful, so it should not involve any fast
> pace or strict quotas or strict time frames. The claimant
> should not be required to remember any detailed information
> to complete the job or to relate any detailed information or
> data to others as part of the job. With those limitations, could
> he return to any of the past relevant work?

(R. 311)  The VE responded the hypothetical individual could return to Clark's past work as a flagger, but the truck driver and car salesman would be precluded by the limitation to simple, routine, repetitive work.  (*Id.*)  The VE's opinion would be unchanged if the individual had to change positions to move around or sit for short period.  (R. 312)  In addition, if the individual could not lift more than 25 pounds occasionally, he still would be able to perform the duties of the flagger, which is classified as light work.  (*Id.*)

The VE stated if the hypothetical individual frequently were unable to complete tasks or tend to his work because of his mental symptoms, then he would be precluded from the flagger job and from all other competitive employment.  (*Id.*)

Upon questioning from Clark's attorney, the VE stated that in the national economy, "[a] flagger is a standing job with . . . probably breaks every couple of hours."  (R. 313) Thus, it would require standing more than six hours in an eight-hour day.  (*Id.*)  However, the VE stated it was her understanding from Clark's testimony that his flagger job allowed him to sit down at times.  (R. 312)  If the hypothetical individual were unable to stand on the job all day, with normal breaks, then that would preclude the flagger job as it is performed in the national economy.  (R. 314)

If the hypothetical individual were moderately limited in his ability to complete a job due to mental health problems, or problems with memory or concentration, causing him not to complete his work at least one day a week, then he would be precluded from competitive employment.  (R. 314-15)

Clark's attorney then clarified, with Clark, that the flagger job required him to be on his feet all of the time, and his employer got mad at him because he would have to take a break and sit down.  (R. 316-17)

## 4.    *The ALJ's decision*

The ALJ found Clark has not "engaged in substantial gainful activity since his protective filing date of October 16, 2002." (R. 14) He observed that Clark had omitted some work history from his background information, noting the Division of Vocational Rehabilitative Services ("DVRS") had paid $1500 for Clark to obtain tools he needed for a job, "and by August 2001, the claimant was employed as a pipe welder making $23.45/hour for a 40-50 hour week." (R. 14-15) The ALJ found Clark's employment history to be "sketchy and vague," and noted his former employer at a truck driving job cited Clark's work performance as "poor." (R. 14)

The ALJ reviewed Clark's medical history with regard to his physical condition, but set forth no conclusions regarding what, if any, of Clark's physical impairments he considered to be severe. (*See* R. 15-17) He then reviewed Clark's history regarding his mental impairments, noting Dr. Minhas had diagnosed Clark with "major depressive disorder, moderate, recurrent," while the state agency psychological consultant had diagnosed him with nonsevere dysthymic disorder and post-traumatic stress disorder ("PTSD"). The ALJ then found "the medical evidence substantiates the presence of medically determinable mental impairments in the claimant's case, as set forth above." (R. 17) It is not clear whether this means the ALJ accepted all of the diagnoses, including the depressive disorder, dysthymic disorder, and PTSD, or only the impairments listed in the paragraph immediately preceding the ALJ's finding, *i.e.*, dysthymic disorder and PTSD. (*See id.*) In either case, the ALJ then found that as a result of his mental impairments, Clark would have a mild degree of limitation in the areas of social functioning, activities of daily living, and maintaining concentration, persistence, or pace. (*Id.*)

The ALJ next reached the conclusion that "the combination of [Clark's] impairments is severe under the Act and Regulations" (R. 17), although not reaching the level of severity to meet or equal any listed impairment in the regulations. (R. 18)

The ALJ considered the factors set forth in *Polaski v. Heckler*, 751 F.2d 943, 948 (8th Cir. 1984), and found Clark's allegations that he is totally unable to work not to be credible, citing the following reasons:

> His medical condition clearly does not preclude all work. The undersigned does not believe much of what the claimant says. He has a very dubious work history, legal history and lifestyle. It is uncertain whether the claimant has a real back problem at all, since there is a lot of inconsistency in the most recent medical reports. The evidence shows that the claimant's own doctors don't believe him, either, as mentioned above. Despite having chest pain and low back pain, the claimant has consistently wanted a lot of Viagra. There are references in the record to the claimant working outside as well. The claimant is very muscular, and the undersigned does not believe that the claimant cannot lift more than 15 pounds. The claimant has been pursued by the authorities for child support for years. All of the above reflects adversely on his general credibility.

(R. 19) The ALJ concluded Clark has the residual functional capacity to lift/carry up to twenty-five pounds frequently and fifty pounds occasionally; stand, walk, or sit for eight hours a day with normal breaks, with only occasional bending, squatting, crawling, stooping, or climbing of stairs; push/pull up to fifty pounds; perform simple, routine, repetitive work that is not stressful or fast-paced; do work that does not require him to remember detailed information or relate detailed information to others; and work in close proximity to the public and coworkers, while having only superficial contact with them. (*Id.*)

Based on his assessment of Clark's RFC, the ALJ concluded Clark could return to his past relevant work as a flagger, and he therefore is not disabled. (*Id.*)

### III. DISABILITY DETERMINATIONS, THE BURDEN OF PROOF, AND THE SUBSTANTIAL EVIDENCE STANDARD

#### A. Disability Determinations and the Burden of Proof

Section 423(d) of the Social Security Act defines a disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 404.1505. A claimant has a disability when the claimant is "not only unable to do his previous work but cannot, considering his age, education and work experience, engage in any other kind of substantial gainful work which exists . . . in significant numbers either in the region where such individual lives or in several regions of the country." 42 U.S.C. § 432(d)(2)(A).

To determine whether a claimant has a disability within the meaning of the Social Security Act, the Commissioner follows a five-step sequential evaluation process outlined in the regulations. 20 C.F.R. §§ 404.1520 & 416.920; *Goff v. Barnhart*, 421 F.3d 785 (8th Cir. 2005); *Dixon v. Barnhart*, 353 F.3d 602, 605 (8th Cir. 2003); *Kelley v. Callahan*, 133 F.3d 583, 587-88 (8th Cir. 1998) (citing *Ingram v. Chater*, 107 F.3d 598, 600 (8th Cir. 1997)). First, the Commissioner will consider a claimant's work activity. If the claimant is engaged in substantial gainful activity, then the claimant is not disabled. 20 C.F.R. § 404.1520(4)(i).

Second, if the claimant is not engaged in substantial gainful activity, the Commissioner looks to see "whether the claimant has a severe impairment that significantly limits the claimant's physical or mental ability to perform basic work activities." *Dixon*, 353 F.3d at 605; *accord Lewis v. Barnhart*, 353 F.3d 642, 645 (8th Cir. 2003). The United States Supreme Court has explained:

> The ability to do basic work activities is defined as "the abilities and aptitudes necessary to do most jobs." . . . Such

abilities and aptitudes include "[p]hysical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling"; "[c]apacities for seeing, hearing, and speaking"; "[u]nderstanding, carrying out and remembering simple instructions"; "[u]se of judgment"; "[r]esponding appropriately to supervision, co-workers, and usual work situations"; and "[d]ealing with changes in a routine work setting."

*Bowen v. Yuckert*, 482 U.S. 137, 140-42, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d 119 (1987) (citing 20 C.F.R. §§ 404.1521(b), 416.921(b)).

Third, if the claimant has a severe impairment, then the Commissioner will consider the medical severity of the impairment. If the impairment meets or equals one of the presumptively disabling impairments listed in the regulations, then the claimant is considered disabled, regardless of age, education, or work experience. 20 C.F.R. § 404.1520; *Kelley*, 133 F.3d at 588.

Fourth, if the claimant's impairment is severe, but it does not meet or equal one of the presumptively disabling impairments, then the Commissioner will assess the claimant's residual functional capacity ("RFC") to determine the claimant's "ability to meet the physical, mental, sensory, and other requirements" of the claimant's past relevant work. 20 C.F.R. §§ 404.1520(4)(iv); 404.1545(4); *see Lewis*, 353 F.3d at 645-46 ("RFC is a medical question defined wholly in terms of the claimant's physical ability to perform exertional tasks or, in other words, 'what the claimant can still do' despite his or her physical or mental limitations.") (citing *Bradshaw v. Heckler*, 810 F.2d 786, 790 (8th Cir. 1987); 20 C.F.R. § 404.1520(e) (1986)); *Dixon, supra*. The claimant is responsible for providing evidence the Commissioner will use to make a finding as to the claimant's RFC, but the Commissioner is responsible for developing the claimant's "complete medical history, including arranging for a consultative examination(s) if necessary, and making every reasonable effort to help [the claimant] get medical reports from [the claimant's] own medical sources." 20 C.F.R. § 404.1545(3). The Commissioner also will consider certain

non-medical evidence and other evidence listed in the regulations.  *See id.*  If a claimant retains the RFC to perform past relevant work, then the claimant is not disabled.  20 C.F.R. § 404.1520(4)(iv).

Fifth, if the claimant's RFC as determined in step four will not allow the claimant to perform past relevant work, then the burden shifts to the Commissioner "to prove that there is other work that [the claimant] can do, given [the claimant's] RFC [as determined at step four], age, education, and work experience."  Clarification of Rules Involving Residual Functional Capacity Assessments, etc., 68 Fed. Reg. 51,153, 51,155 (Aug. 26, 2003).  The Commissioner must prove not only that the claimant's RFC will allow the claimant to make an adjustment to other work, but also that the other work exists in significant numbers in the national economy.  *Id.*; 20 C.F.R. § 404.1520(4)(v); *Dixon, supra*; *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001) ("[I]f the claimant cannot perform the past work, the burden then shifts to the Commissioner to prove that there are other jobs in the national economy that the claimant can perform.") (citing *Cox v. Apfel*, 160 F.3d 1203, 1206 (8th Cir. 1998)); *Nevland v. Apfel*, 204 F.3d 853, 857 (8th Cir. 2000).  If the claimant can make an adjustment to other work that exists in significant numbers in the national economy, then the Commissioner will find the claimant is not disabled.  If the claimant cannot make an adjustment to other work, then the Commissioner will find the claimant is disabled.  20 C.F.R. § 404.1520(r)(v).  At step five, even though the burden of production shifts to the Commissioner, the burden of persuasion to prove disability remains on the claimant.  *Goff*, 421 F.3d at 790 (citing *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004)).

## B. *The Substantial Evidence Standard*

The court reviews an ALJ's decision to determine whether the ALJ applied the correct legal standards, and whether the factual findings are supported by substantial evidence on the record as a whole. *Hensley v. Barnhart*, 352 F.3d 353, 355 (8th Cir. 2003); *Banks v. Massanari*, 258 F.3d 820, 823 (8th Cir. 2001) (citing *Lowe v. Apfel*, 226 F.3d 969, 971 (8th Cir. 2000)); *Berger v. Apfel*, 200 F.3d 1157, 1161 (8th Cir. 2000) (citing 42 U.S.C. § 405(g); *Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971)). This review is deferential; the court "must affirm the Commissioner's decision if it is supported by substantial evidence on the record as a whole. *Pelkey v. Barnhart*, 433 F.3d 575, 578 (8th Cir. 2006); 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ."). Under this standard, "[s]ubstantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." *Krogmeier v. Barnhart*, 294 F.3d 1019, 1022 (8th Cir. 2002) (citing *Prosch v. Apfel*, 201 F.3d 1010, 1012 (8th Cir. 2000)); *accord Pelkey, supra* (quoting *Goff*, 421 F.3d at 789).

Moreover, substantial evidence "on the record as a whole" requires consideration of the record in its entirety, taking into account both "evidence that detracts from the Commissioner's decision as well as evidence that supports it." *Id.* The court must "search the record for evidence contradicting the [Commissioner's] decision and give that evidence appropriate weight when determining whether the overall evidence in support is substantial." *Baldwin v. Barnhart*, 349 F.3d 549, 555 (8th Cir. 2003) (also citing *Cline, supra*).

In evaluating the evidence in an appeal of a denial of benefits, the court must apply a balancing test to assess any contradictory evidence. *Sobania v. Secretary of Health & Human Serv.*, 879 F.2d 441, 444 (8th Cir. 1989) (citing *Steadman v. S.E.C.*, 450 U.S. 91,

99, 101 S. Ct. 999, 1006, 67 L. Ed. 2d 69 (1981)). The court, however, does not "reweigh the evidence presented to the ALJ," *Baldwin*, 349 F.3d at 555 (citing *Bates v. Chater*, 54 F.3d 529, 532 (8th Cir. 1995)), or "review the factual record *de novo*." *Roe v. Chater*, 92 F.3d 672, 675 (8th Cir. 1996) (citing *Naber v. Shalala*, 22 F.3d 186, 188 (8th Cir. 1994)). Instead, if, after reviewing the evidence, the court finds it "possible to draw two inconsistent positions from the evidence and one of those positions represents the agency's findings, [the court] must affirm the [Commissioner's] decision." *Id.* (quoting *Robinson v. Sullivan*, 956 F.2d 836, 838 (8th Cir. 1992), and citing *Cruse v. Bowen*, 867 F.2d 1183, 1184 (8th Cir. 1989)); *accord Baldwin*, 349 F.3d at 555; *Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000). This is true even in cases where the court "might have weighed the evidence differently." *Culbertson v. Shalala*, 30 F.3d 934, 939 (8th Cir. 1994) (citing *Browning v. Sullivan*, 958 F.2d 817, 822 (8th Cir. 1992)); *accord Krogmeier*, 294 F.3d at 1022 (citing *Woolf*, 3 F.3d at 1213). The court may not reverse the Commissioner's decision "merely because substantial evidence would have supported an opposite decision." *Goff*, 421 F.3d at 789 ("[A]n administrative decision is not subject to reversal simply because some evidence may support the opposite conclusion."); *Baldwin*, 349 F.3d at 555 (citing *Grebenick v. Chater*, 121 F.3d 1193, 1198 (8th Cir. 1997)); *Young*, 221 F.3d at 1068; *see Pearsall*, 274 F.3d at 1217; *Gowell*, 242 F.3d at 796; *Spradling v. Chater*, 126 F.3d 1072, 1074 (8th Cir. 1997).

On the issue of an ALJ's determination that a claimant's subjective complaints lack credibility, the Sixth and Seventh Circuits have held an ALJ's credibility determinations are entitled to considerable weight. *See, e.g., Young v. Secretary of H.H.S.,* 957 F.2d 386, 392 (7th Cir. 1992) (citing *Cheshier v. Bowen,* 831 F.2d 687, 690 (7th Cir. 1987)); *Gooch v. Secretary of H.H.S.,* 833 F.2d 589, 592 (6th Cir. 1987), *cert. denied*, 484 U.S. 1075, 108 S. Ct. 1050, 98 L. Ed. 2d. 1012 (1988); *Hardaway v. Secretary of H.H.S.,* 823 F.2d 922, 928 (6th Cir. 1987). Nonetheless, in the Eighth Circuit, an ALJ may not

discredit a claimant's subjective allegations of pain, discomfort or other disabling limitations simply because there is a lack of objective evidence; instead, the ALJ may only discredit subjective complaints if they are inconsistent with the record as a whole. *See Hinchey v. Shalala,* 29 F.3d 428, 432 (8th Cir. 1994); *see also Bishop v. Sullivan,* 900 F.2d 1259, 1262 (8th Cir. 1990) (citing *Polaski v. Heckler,* 739 F.2d 1320, 1322 (8th Cir. 1984)). As the court explained in *Polaski v. Heckler:*

> The adjudicator must give full consideration to all of the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as:
>
> 1)  the claimant's daily activities;
> 2)  the duration, frequency and intensity of the pain;
> 3)  precipitating and aggravating factors;
> 4)  dosage, effectiveness and side effects of medication;
> 5)  functional restrictions.

*Polaski*, 739 F.2d 1320, 1322 (8th Cir. 1984). *Accord Ramirez v. Barnhart*, 292 F.3d 576, 580-81 (8th Cir. 2002). The court must "defer to the ALJ's determinations regarding the credibility of testimony, so long as they are supported by good reasons and substantial evidence." *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005).

## IV. ANALYSIS

Clark argues the ALJ erred in failing to specify which of Clark's impairments he considered to be severe. He asserts that without this information, it is "impossible to determine how the ALJ arrived at his residual functional capacity finding." (Doc. No. 12, pp. 15-17) The Commissioner disagrees, noting the ALJ considered the evidence relating to all of Clark's impairments, and reached a finding that in combination, his impairments were severe. The Commissioner implicitly asserts it was acceptable for the ALJ not to list

each separate impairment he considered to be severe, when he did not find that any single impairment was severe, only that the combination of all of Clark's impairments was severe. (Doc. No. 13, pp. 12-13)

Clark further argues the ALJ's residual functional capacity ("RFC") assessment is not supported by the record evidence. (Doc. No. 12, pp. 15, 17-22) He argues the ALJ relied only on his determination that Clark's testimony was not credible, and not on appropriate medical evidence, in assessing Clark's RFC. The Commissioner argues Clark had "the burden of proving RFC." (Doc. No. 13, p. 16) The Commissioner asserts the ALJ properly discounted Dr. Reveiz's opinion in determining that Clark could return to his past work as a flagman, even though that job required him to be on his feet all day. (*Id.*, p. 17)

The court first notes the ALJ was presented with a difficult case to evaluate. The Social Security worker who assisted Clark with his application forms noted it was difficult to elicit information from him, and this observation is borne out by the hearing transcript. Clark's responses were incomplete, vague, sketchy, and often unresponsive. Nevertheless, the ALJ had a duty to fully and fairly develop the record in order to reach a decision regarding Clark's allegation of disability. This would include developing the record sufficiently to make a determination regarding Clark's RFC. As noted above, a claimant has a duty to provide evidence the Commissioner will use in making the RFC finding, but the Commissioner is responsible for developing the claimant's "complete medical history, including arranging for a consultative examination(s) if necessary[.]" 20 C.F.R. § 404.1545(3). The current record contains no physical RFC assessment by any consulting medical expert. Two consulting physicians reviewed the record, in February and March 2003, and reached the conclusion that Clark's medically-determinable physical impairments were not severe, but neither of them offered an assessment of Clark's functional limitations. Nevertheless, the ALJ reached the conclusion that Clark would be

able to lift twenty-five pounds frequently and fifty pounds occasionally; stand, walk, or sit for eight hours a day with normal breaks; and push or pull up to fifty pounds. The court cannot find substantial medical evidence in the record to support these findings.

In considering whether an ALJ has failed to develop the record fully, the relevant inquiry is whether the claimant "was prejudiced or treated unfairly by how the ALJ did or did not develop the record; absent unfairness or prejudice, we will not remand." *Onstad v. Shalala*, 999 F.2d 1232, 1234 (8th Cir. 1993) (citing *Phelan v. Bowen*, 846 F.2d 478, 481 (8th Cir. 1988)). In the present case, the court finds Clark was prejudiced by the ALJ's failure to develop the record fully and fairly with regard to Clark's physical functional limitations.

Besides the lack of evidentiary support in the record for the ALJ's RFC determination, the court's conclusion is based on two additional concerns. First, in October 1994, a different ALJ found the medical evidence showed Clark had "severe degenerative arthritis of the lumbar spine at L5-S1, and degenerative disc disease of the L5 disc; chronic low back and neck pain; pain and intermittent swelling of the right scrotum; and recurrent inflammatory uveitis of the left eye." (R. 34) At that time, the ALJ found Clark could not walk more than 100 feet, stand for more than fifteen minutes, sit for more than thirty minutes, and lift/carry more than five to ten pounds occasionally, with no repeated lifting of any amount of weight. (R. 35) It is of some concern to the court that the record contains no evidence to suggest Clark's degenerative arthritis had – or had not – improved since 1994, nor does the record contain other evidence to explain this inconsistency.

A secondary concern in the present case is the suggestion that the ALJ's decision was based partially on his dislike of Clark, and his disapproval of Clark's lifestyle and history, rather than solely on the record evidence. For example, the ALJ speculated that Clark's inability to provide a coherent work and business history "appears to be due to him

owing child support." (R. 14) As noted above, despite the difficulties in evaluating this claimant, the ALJ had a duty to do so fully and fairly.

The court concurs in the ALJ's determination that Clark's allegations are not fully credible. The court further concurs in the ALJ's determination that Clark's mental impairments would cause no more than mild to moderate limitations and are non-severe. However, the court finds the record does not contain substantial evidence to support the ALJ's RFC determination, or his conclusion that Clark can return to his past relevant work as a flagman. Because the ALJ's RFC determination was fault, his hypothetical question to the VE also was deficient. Nevertheless, despite these findings, the court disagrees with Clark's assertion that the record contains substantial evidence to support an immediate award of benefits. The court recommends this case be remanded for a new hearing, before a different ALJ, with instructions to more fully develop the record with regard to Clark's physical functional limitations.

## V. CONCLUSION

Therefore, **IT IS RESPECTFULLY RECOMMENDED**, for the reasons discussed above, unless any party files objections[6] to the Report and Recommendation in accordance with 28 U.S.C. § 636 (b)(1) and Fed. R. Civ. P. 72(b), within ten (10) days of the service of a copy of this Report and Recommendation, that the Commissioner's decision be

---

[6]Objections must specify the parts of the report and recommendation to which objections are made. Objections must specify the parts of the record, including exhibits and transcript lines, which form the basis for such objections. *See* Fed. R. Civ. P. 72. Failure to file timely objections may result in waiver of the right to appeal questions of fact. *See Thomas v. Arn*, 474 U.S. 140, 155, 106 S. Ct. 466, 475, 88 L. Ed. 2d 435 (1985); *Thompson v. Nix*, 897 F.2d 356 (8th Cir. 1990).

reversed and this case be remanded pursuant to sentence four of 42 U.S.C. § 405(g), for further proceedings as discussed above.

**IT IS SO ORDERED.**

**DATED** this 10th day of March, 2006.

PAUL A. ZOSS
MAGISTRATE JUDGE
UNITED STATES DISTRICT COURT